**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**BENJAMIN HENDRICKS,**

       **Plaintiff,**

                                    **Civil Action 2:11-cv-937**
      **v.**                           **Judge George C. Smith**
                                      **Magistrate Judge Elizabeth P. Deavers**

**JOHN DESMARAIS,** *et al.***,**

       **Defendants.**

## ORDER AND REPORT AND RECOMMENDATION

Plaintiff, an inmate at Pickaway Correctional Institution ("PCI"), brings this civil rights action under 42 U.S.C. § 1983 against Defendants John DesMarais, the former Medical Director of the Ohio Department of Rehabilitation and Corrections ("ODRC"); Dr. Eddy, the current Medical Director of ODRC; and Tobbi Reeves-Valentine, the Healthcare Administrator ("HCA")/Medical Operations Manager of PCI. (Compl. ¶¶ 9-11, ECF No. 6.) This matter is before the Court for consideration of Defendants' Motion for Summary Judgment. (ECF No. 46.) Plaintiff filed his Response in Opposition to Defendants' Motion on June 19, 2013. (ECF No. 51.) Defendants filed their Reply on July 10, 2013. (ECF No. 54.) Also before the Court is Plaintiff's July 25, 2013 Motion for Leave to File Sur-Reply. (ECF No. 55.) For the reasons that follow, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED** and that judgment be entered in favor of Defendants.

## I.

According to the evidence presented with respect to Defendants' Motion for Summary Judgment, officials at PCI sent Plaintiff to a neurologist in approximately June 2009, who

confirmed that Plaintiff suffers from a seizure disorder.  (Op. Ex. K, ECF No. 51-11.)  The neurologist prescribed a medication called Keppra to treat Plaintiff's condition.  On July 14, 2009, prison medical staff requested approval from the state medical director to administer Keppra, which was considered a non-formulary drug.  (Op. Ex. L, ECF No. 51-12.)  The approval form, which is unsigned, indicates that Plaintiff needed Keppra because his then-current seizure medication, Depacote, caused him to suffer adverse side effects.  *Id.*  In response to the request, an individual at the state medical director's office wrote, "I do not see any allergies listed for Dilantin [and two other drugs]; these are first-line agents."  *Id.*  The individual suggested trying one of these first-line agents before approving Keppra.  *Id.*

The record indicates that prison medical staff thereafter began to administer Dilantin to treat Plaintiff's condition, which soon caused him to suffer an allergic reaction.  Plaintiff was taken to the emergency room on October 9, 2009, where, over the course of the following three days, doctors reported a rash on Plaintiff's arms and chest, painful mouth and difficulty swallowing, and a fever.  (Op. Ex. M, N, P, ECF Nos. 51-13 through 51-16.)  Doctors noted that Plaintiff "was started on Dilantin about six days ago in prison, in spite of the fact that he is allergic to a lot of medicines."  (Op. Ex. R, ECF No. 51-18.)  Plaintiff was diagnosed with Stevens-Johnson syndrome secondary to Dilantin allergy.  (Op. Ex. P, 3, ECF No. 51-16.)  Following this incident, prison medical staff approved and administered Keppra to treat Plaintiff's disorder.  (Op. Ex. S, ECF No. 51-19.)

The evidence demonstrates that  the state medical director's approval for Keppra expired on December 20, 2010.  Due to delays in obtaining additional approval, Plaintiff did not receive a refill of his medication until January 18, 2011, when prison medical staff provided him with a two-week supply of Keppra.  (Op. Ex. X, ECF No. 51-24.)  On February 11, 2011, Plaintiff filed

a grievance with Defendant Tobbi Reeves-Valentine, complaining that he was out of Keppra and expressing concern that the lack of Keppra could cause medical complications.  (Op. Ex. U, ECF No. 51-21.)  In response, Defendant Reeves-Valentine mistakenly indicated that Plaintiff's January 18, 2011 supply should have lasted until February 17, 2011, and that it is his responsibility to inform medical when he runs out of medication.  *Id.*  Apparently, Defendant Reeves-Valentine was under the impression that Plaintiff would take one pill per day rather than two, which caused him to miscalculate the length of his medication supply.  (Op. Ex. X, ECF No. 51-24.)

On February 24, 2011, Plaintiff took his complaint against Reeves-Valentine to the next level of the prison grievance process, and filed a notification of grievance.[1]  (Op. Ex. V, ECF No. 51-22.)  In his grievance, Plaintiff complained that prison medical staff had failed to complete the necessary paperwork to obtain approval for Keppra.  Plaintiff indicated that he had suffered at least three seizures due to a lack of Keppra.  *Id.*  On April 13, 2011, the Inspector of Institutional Operations responded to Plaintiff's grievance, indicating that on March 14, 2011 medical services approved a six-month supply of Keppra.  (Op. Ex. W, ECF No. 51-23.)  The Inspector further indicated that he or she "did verify that staff made every effort according to policy to insure you received the prescribed medication Keppra."  *Id.*

In the final stage of the grievance process, Plaintiff appealed to the Chief Inspector, Mona Parks, who issued a decision on June 17, 2011.  (Op. Ex. X, ECF No. 51-24.)  Ms. Parks indicated in her decision that she reviewed Plaintiff's medical records, and she confirmed that

---

[1] Although Plaintiff's notification of grievance bears a date of February 24, 2011, all subsequent steps in the appeal process refer to the notification of grievance as being filed on April 11, 2004. (Op. Exs. W, X, ECF Nos. 51-23 51-24.)  Construing the facts in the light most favorable to Plaintiff, the Undersigned proceeds as if Plaintiff filed his grievance on February 24 rather than April 11.

the approval for Keppra expired on December 20, 2010. *Id.* at 1. She also confirmed that Plaintiff received a two-week supply of Keppra on January 18, 2011, but that Defendant Reeves-Valentine had mistakenly calculated that the supply would last a month. *Id.* Ms. Parks further indicated that Plaintiff had seen a physician on February 9, 2011, where he complained that he ran out of Keppra the day before. In that medical report, according to Ms. Parks' review, a nurse indicated that the pharmacy staff refused to refill Keppra until prison staff faxed a copy of the approval form. The nurse documented that the form was faxed to the pharmacy on January 15, 2011 and again on January 21, 2011.[2] *Id.* Ms. Parks also referenced a February 17, 2011 medical record in which Plaintiff complained of experiencing seizure activity. *Id.* Ultimately, Ms. Parks indicated that she would instruct the HCA to review the matter with the staff members involved to develop a written plan of action to ensure that Plaintiff would not be left without Keppra again. *Id.* at 2.

The very next day, on June 18, 2011, the state medical director's office declined to approve a refill of Keppra on the grounds that Plaintiff's March 2011 blood test revealed an absence of Keppra in his system. (Op. Ex. Y, ECF No. 51-25.) Although the request form indicated that Plaintiff suffers "multiple allergies" to medications, the state medical director's office directed prison medical staff to start Plaintiff on Dilantin or Valproic Acid and place him in the infirmary until they receive confirmation "from outside" medical records that Plaintiff suffers from a seizure disorder. *Id.*

---

[2] It appears that pharmacy staff requested the form again on February 21, 2011 and on March 14, 2011. *See* Mot. Ex. D, 2, ECF No. 46-4 (February 21, 2011 doctor note indicating that the authorization needed to be faxed to the pharmacy again); Mot. Ex. D, 4, ECF No. 46-4 (March 14, 2011 note indicating that the authorization needed to be faxed to the pharmacy).

On July 6, 2011, Plaintiff wrote a letter to Chief Inspector Mona Parks regarding the denial of Keppra.  In the letter, Plaintiff indicated that his March 2011 blood test was negative for Keppra because that was the period in which he was not given Keppra.  (Op. Ex. AA, ECF No. 51-27.)  On July 8, 2011, prison medical staff ordered that Plaintiff be transferred to the infirmary and placed on seizure precautions until further notice.  (Op. Ex. AA, ECF No. 51-27.)  Prison medical staff noted an absence of seizure activity on July 9 and 10, 2011.  (Mot. Ex. E, 21, ECF No. 46-6.)  Prison officials later refilled Plaintiff's prescription and resumed providing him Keppra.

## II.

As a preliminary matter, Plaintiff's Motion to File Sur-Reply is **GRANTED IN PART AND DENIED IN PART**.  (ECF No. 55.)  Specifically, Plaintiff's Motion is **GRANTED** to the extent he seeks leave to file the Sur-Reply to respond to Defendants' challenge to an affidavit Plaintiff attached to his Response in Opposition.  Pursuant to S.D. Ohio Civ. R. 7.2(a)(2), the Court sets forth the following procedure for opposing and reply memoranda:

> Any memorandum in opposition shall be served within twenty-one (21) days from the date of service set forth in the certificate of service attached to the Motion. Failure to file a memorandum in opposition may be cause for the Court to grant any Motion, other than one which would result directly in entry of final judgment or an award of attorney fees. A reply memorandum may be served within fourteen (14) days after the date of service of the memorandum in opposition. *No additional memoranda beyond those enumerated will be permitted except upon leave of court for good cause shown.*

S.D. Ohio Civ. R. 7.2(a)(2) (emphasis added).  Although Plaintiff failed to seek advance leave to file his Sur-Reply, the Court finds that good cause exists to permit his Sur-Reply.  In their Reply, Defendants assert that Plaintiff presented a false affidavit in support of his Response in Opposition.  (Reply 3, ECF No. 54.)  One of the two issues Plaintiff raises in his Sur-Reply aims

to correct any misunderstanding related to the affidavit. (Sur-Reply 1-2, ECF No. 55.) Accordingly, Plaintiff responds to an issue raised for the first time in Defendants' Reply brief, which justifies filing a Sur-Reply.

Plaintiff's Motion is **DENIED**, however, to the extent it seeks appointment of an expert witness. In his Motion, Plaintiff cites Rule 706(a) of the Federal Rules of Evidence to support a request for the appointment of an expert to address his deliberate indifference claims. "Under Fed. R. Evid. 706, appointment of an expert 'rests solely in the Court's discretion and is to be informed by such factors as the complexity of the matters to be determined and the Court's need for a neutral, expert view.'" *Stanley v. Ohio Dept. of Rehabilitation*, No. C2-02-178, 2002 WL 31844686, *3 (S.D. Ohio Dec. 12, 2002) (quoting *Pabon v. Goord*, No. 99-CIV-5869, 2001 WL 856601, *1 (S.D.N.Y. July 30, 2001)). Furthermore, "courts may appoint an expert 'if scientific, technical, or other specialized knowledge will assist the trier-of-fact to understand the evidence or decide a fact in issue.'" *Id.* (quoting *Ledford v. Sullivan*, 105 F.3d 354, 358-59 (7th Cir. 1999)). Here, the ultimate issue is whether Defendants acted with deliberate indifference to Plaintiff's serious medical needs, which is not as involved as a claim for medical malpractice. *See Hughes v. Lavender*, No. 2:10-CV-674, 2011 WL 2550740, *2 (S.D. Ohio June 23, 2011) (citing *Ledford*, 105 F.3d at 359-60) (denying request for appointment of expert in deliberate indifference claim, and noting that the "test for deliberate indifference is not as involved as that for medical malpractice"). At this juncture, the Court is not in need of expert testimony to resolve Defendants' Motion for Summary Judgment. Accordingly, Plaintiff's Motion for Appointment of Expert is **DENIED**.

# III.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party."  *Stansberry v. Air Wisc. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'"  *Kimble v. Wasylyshyn*, No. 10–3110, 2011 WL 4469612, at *3 (6th Cir. Sept. 28, 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record").  "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts. . . .  [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute."  *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted).  "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate."  *Stanberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## IV.

**A.      Claims Arising From Defendants' Alleged 2010-2011 Failure to Administer Keppra**

Defendants contend that no genuine issue of material fact exists as to whether their

failure to administer Keppra constitutes deliberate indifference in violation of the Eighth

Amendment.  The Undersigned agrees.

It is well established that "[t]he Eighth Amendment forbids prison officials from

unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference

toward [his] serious medical needs."  *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir.

2010) (internal quotations and citations omitted).  A claim for deliberate indifference "has both

objective and subjective components."  *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir.

2011).  The United States Court of Appeals for the Sixth Circuit has explained:

> The objective component mandates a sufficiently serious medical need.
> [*Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir.2004).]   The
> subjective component regards prison officials' state of mind.  *Id.*  Deliberate
> indifference "entails something more than mere negligence, but can be satisfied
> by something less than acts or omissions for the very purpose of causing harm or
> with knowledge that harm will result." *Id.* at 895–96 (internal quotation marks
> and citations omitted). The prison official must "be aware of facts from which the
> inference could be drawn that a substantial risk of serious harm exists, and he
> must also draw the inference." *Id.* at 896 (internal quotation marks and citation
> omitted).

*Barnett v. Luttrell*, 414 F. App'x 784, 787–88 (6th Cir. 2011).  The Sixth Circuit has also noted

that in the context of deliberate indifference claims:

> [W]e distinguish between cases where the complaint alleges a complete denial of
> medical care and those cases where the claim is that a prisoner received
> inadequate medical treatment.  Where a prisoner alleges only that the medical
> care he received was inadequate, federal courts are generally reluctant to second
> guess medical judgments.  However, it is possible for medical treatment to be so
> woefully inadequate as to amount to no treatment at all.

*Alspaugh*, 643 F.3d at 169 (internal quotations and citations omitted).  Along similar lines, "[o]rdinary medical malpractice does not satisfy the subjective component."  *Grose v. Corr. Med. Servs., Inc.*, 400 F. App'x 986, 988 (6th Cir. 2010).  Furthermore, "a difference of opinion between [a prisoner] and the prison health care providers and a dispute over the adequacy of [a prisoner's] treatment . . . does not amount to an Eighth Amendment claim."  *Apanovitch v. Wilkinson*, 32 F. App'x 704, 707 (6th Cir. 2002).

Here, Defendants contend that no genuine issue of material fact exists with respect to either of the two elements of a deliberate indifference claim.  With respect to the objective component, Defendants deny that they ever failed to administer Keppra to Plaintiff.  (Mot. 9, ECF No. 46.)  Consequently, they maintain that Plaintiff never was subjected to an objective risk of harm as required to establish the first element of a claim of deliberate indifference.  Rather, according to Defendants, "[t]he undisputed medical and testimonial evidence demonstrates that . . . Keppra was available for [Plaintiff] to self-administer/refill on his own."  *Id.* at 10.  Likewise, with respect to the subjective component, Defendants assert that "it is impossible for Plaintiff to substantiate a claim of knowledge against the Defendants for denying him a medication that was, in actuality, available to him."  (Mot. 10, ECF No. 46.)

In support of their position, Defendants point to various ambiguities in the medical records.  For example, Defendants rely upon the Chief Inspector's decision on Plaintiff's grievances, wherein she noted that Plaintiff was approved for Keppra from February 22, 2011 through June 30, 2011, to contend that Plaintiff was provided with Keppra through those dates.  (Reply, 5) (citing Op. Ex. X, 2, ECF No. 51-24.)  Defendants also point to various instances in the record indicating that Plaintiff was responsible for notifying medical personnel when he ran

out of medication, and contend that if Plaintiff was without Keppra for any length of time it was because he failed to request a refill.  (Reply 4, ECF No. 54) (citing Op. Ex. V, ECF No. 51-22.)  Lastly, Defendants provide an affidavit from a PCI medical professional who indicates that, based upon his review of the record, "Keppra has been approved/ordered for [Plaintiff] except in instances where it appeared he either failed to appropriately self-administer the medication or he hoarded same . . . ." (Mot. Ex. A, ¶ 9, ECF No. 46-1.)

Construing the evidence in the light most favorable to Plaintiff, however, as this Court must, the record demonstrates that Defendants indeed failed to provide Plaintiff with Keppra from approximately mid-February until early April 2011.  (Op. Exs. X, U, ECF Nos. 51-24 and 51-21.)  Although the Chief Inspector's decision suggests that Plaintiff was approved for Keppra from February 22, 2011 through June 30, 2011, the record indicates that the approval process is distinct from the process required to actually fill Plaintiff's prescription.  *Compare* Op. Exs. L, S. and Y, ECF Nos. 51-12, 51-19, and 51-25 (approval forms seeking authorization to fill Keppra), *with* Op. Ex. X, ECF No. 51-24 (disposition of grievance in which Chief Inspector references nurses' notes stating that they had to fax a request to the pharmacy to fill Plaintiff's prescription); Mot. Ex. D, 2, ECF No. 46-4 (February 21, 2011 medical record noting that the nurse had to fax a request form to the pharmacy to fill the prescription).

Furthermore, although several records suggest that Plaintiff was able to self-administer his medication and was responsible for requesting a refill when he ran out, the evidence leaves little doubt that Plaintiff was out of Keppra at various points in 2011 and that he complained to Defendant Reeves-Valentin about it.  He also completed the grievance process regarding the lack of medication.  In fact, in disposing of Plaintiff's grievance, the Chief Inspector reviewed the

10

record and acknowledged that Plaintiff was not given Keppra for a period of time.  (Op. Ex. X, ECF No. 51-24.)  Relatedly, although Nurse Ayers is technically correct in averring that Keppra was approved and ordered for Plaintiff except when it appeared he failed to appropriately self-administer the medication, the record indicates that, at least for the periods set forth above, Plaintiff did not receive the medication that was approved and ordered.  In addition, the evidence fails to bear out Defendants' contention that Plaintiff failed to appropriately self-administer his medication.  Although a medical professional erroneously arrived at such a conclusion based on the negative results of Plaintiff's March 2011 blood test, as Plaintiff's points out, Defendants failed to provide him with Keppra in March 2011.  Finally, Plaintiff has adduced some evidence that he suffered seizures as a result of not having been provided Keppra.  (Op. Ex. X, ECF No. 51-24.)

Nevertheless, even construing the facts in the light most favorable to Plaintiff, no reasonable jury could conclude that Defendants acted with deliberate indifference in failing to provide his medication.  Rather, the evidence establishes that Defendants acted with no more than negligence.  Prison officials sent numerous requests seeking approval of Plaintiff's medication, but apparently failed to timely follow-up with those requests.  (Op. Exs. L, S. and Y, ECF No. 51-12, 51-19, and 51-25.)  They also delayed following-up with the numerous requests they sent to the pharmacy to have Plaintiff's prescription refilled.  (Op. Ex. X, ECF No. 51-24, Mot. Ex. D, 2, 4, ECF No. 46-4.)  On one occasion, Defendant Reeves-Valentin negligently miscalculated Plaintiff's dosage in determining that he should not have been out of Keppra.  (Op. Ex. V, ECF No. 51-22.)  Another member of the prison medical staff relied on the March 2011 negative blood test results to erroneously conclude that Plaintiff failed to take Keppra as

directed.  (Op. Ex. Y, ECF No. 51-25.)  A review of the file would have revealed that Plaintiff

was not given Keppra in March 2011.  At most, however, these failures constitute medical

negligence rooted in a lack of follow-through, a failure to adequately review the file, and

miscalculation.  The evidence does not demonstrate that Defendants refused to refill Plaintiff's

prescription or that they were deliberately indifferent to doing so.  *See Jones v. Martin*, 9 Fed.

App'x 360, 361 (6th Cir. 2001) ("Although there was a lapse in [the plaintiff's] medication, he

did not establish that [the prison doctor] intentionally denied him blood pressure medicine . . . .

[A]llegations of inadvertent failure to provide adequate medical care fail to state an Eighth

Amendment cause of action."); *King v. McCreary Cnty. Jail*, No. 6:04-221-DCR, 2005 WL

1514304, * 6-7 (E.D. Ky. June 24, 2005) (granting summary judgment where the evidence

merely revealed repeated delays, rather than a complete failure, in refilling inmate's

prescriptions); *Pendergraph v. Evans*, No. 4:03-cv-61, 2006 WL 2987729, *4 (E.D. Tenn. Oct.

17, 2006) ("[I]t would appear that the defendants did not promptly provide medical treatment to

plaintiff upon request[, and] that plaintiff did not receive certain prescribed medication, possibly

due to budget constraints.  There is nothing in the record to suggest, however, that the

defendants' conduct amounted to an intent to inflict unnecessary pain or suffering [as is]

necessary to a finding of deliberate indifference."); *Cf. Northington v. Armstrong*, No. 1:10-cv-

424, 2011 WL 3209085, *11 (W.D. Mich. Apr. 5, 2011) (finding that the plaintiff stated a

deliberate indifference claim where he alleged that prison medical staff refused to refill a

prescription for antibiotics).  Defendants' medical negligence does not violate the Constitution.

*Grose*, 400 F. App'x at 988.  Thus, Plaintiff has failed to demonstrate that any Defendant was

"aware of facts from which the inference could be drawn that a substantial risk of serious harm

12

exists, and [that he] also dr[ew] the inference." *Barnett*, 414 Fed. App'x at 788 (internal quotation marks and citations omitted).

Along similar lines, Defendants are entitled to qualified immunity with respect to their delay in refilling Plaintiff's prescription. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotation marks and citations omitted). The determination of whether a government official is entitled to qualified immunity involves two inquiries. *Miller v. Sanilac County*, 606 F.3d 240, 247 (6th Cir. 2010). "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* (internal quotation marks and citations omitted). The Court need not consider these inquiries sequentially. *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009) (citation omitted). "Once it is determined that the right is clearly established, the [C]ourt must determine 'whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was

13

objectively unreasonable in light of [the] clearly established constitutional rights.'" *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994)).

Here, Plaintiff has not adduced sufficient evidence to create a genuine issue of material fact as to whether Defendants acted objectively unreasonably in light of clearly established law. As set forth above, at most, Defendants acted negligently in refilling Plaintiff's prescription. Accordingly, the Undersigned concludes that summary judgment is appropriate on Plaintiff's deliberate indifference claim arising from Defendants failure to timely administer Keppra in 2010-2011, and, in any event, Defendants are entitled to qualified immunity.

**B.     Claims Arising From 2009 Hospital Stay**

Defendants also seek summary judgment on Plaintiff's claim related to his 2009 hospitalization arising from an allergic reaction to Dilantin.  Defendants contend that any claim arising from the hospitalization is barred by the statute of limitations.  For claims brought under § 1983, this Court applies the statute of limitations for personal-injury tort actions in the state where the cause of action originated.  *Hall v. Spencer Cnty., Ky.*, 583 F.3d 930, 933 (6th Cir. 2009).  Ohio imposes a two-year statute of limitations to personal injury actions, which the Sixth Circuit has applied to § 1983 claims.  *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1105 (6th Cir. 1995).  Federal law, however, determines when the statute of limitations begins to run.  *Hebron v. Shelby Cnty. Gov.*, 406 Fed. App'x 28, 30 (6th Cir. 2010 (citing *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003)).  Under federal law, generally "'the limitations clock begins to run when the claimant knows or should have known that the defendant violated their rights.'"  *Id.* (quoting *Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001)).

14

Here, the Undersigned concludes that Plaintiff's purported claim arising from his 2009 hospitalization is barred by the statute of limitations.  Plaintiff attached medical records to his Complaint that demonstrate he was hospitalized on October 10, 2009 related to his ingestion of Dilantin.  (Compl. Ex. A, ECF No. 6-1.)  Those and other records submitted with Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment demonstrate that Plaintiff complained to emergency room doctors that prison medical staff started him on Dilantin despite his history of allergies, which is what caused the allergic reaction.  *See* Op. Ex. R, 1, ECF No. 51-18 (noting that Plaintiff informed emergency room doctors that he had started Dilantin six days prior, "in spite of the fact that he is allergic to a lot of medicines").  Thus, Plaintiff knew of Defendants' conduct allegedly giving rise to his claim on October 10, 2009.  In his declaration attached to his Motion to Proceed Without Prepayment of Fees, which Plaintiff filed along with his Complaint, Plaintiff avers that he placed his Motion and Complaint in the prison mailbox to be mailed to the Court on October 13, 2011.  (Mot 5, ECF No. 1.)  Consequently, in light of the prison mailbox rule, Plaintiff's Complaint is deemed to be filed on October 13, 2011, two days after the two-year statute of limitations expired.  *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (noting that under the prison mailbox rule a prisoner's complaint is deemed filed when it is handed over to prison officials for mailing to the court).  Consequently, Plaintiff's claim is barred by the statute of limitations.

Plaintiff's contrary argument is unavailing.  Plaintiff contends that although he was hospitalized on October 10, 2009, he did not discover that prison medical staff caused his injury until late October because, until that time, prison medical staff lied to him about the severity of his allergic reaction.  (Op. 14, ECF No. 17.)  According to Plaintiff, prison medical staff

indicated that he "had suffered 'merely an allergic reaction' when in fact he had suffered much worse." *Id.* at 17-18.  Nevertheless, Plaintiff knew on October 10, 2009 that he suffered an allergic reaction so severe that he required immediate medical attention to treat a rash, sore throat and swollen throat.  (Op. Ex. R., 1, ECF No. 51-18.)  He also knew that the reaction was brought on by prison officials' decision to give him Dilantin.  *Id.*  Although he alleges that he was unaware of the severity of the reaction, any claim arising from prison officials' change in Plaintiff's medication would have arose, at the latest, when he suffered the reaction on October 10, 2009, the date on which Plaintiff would have known or should have known of the purported constitutional violation.  *Hebron*, 406 Fed. App'x at 30.

Even assuming Plaintiff's purported claim is not barred by the statute of limitations, summary judgment with respect to this claim is nevertheless appropriate.  Nothing in the record even remotely suggests that Defendants switched Plaintiff to Dilantin due to deliberate indifference to his serious medical needs.  Rather, the state medical director decided, in his professional opinion, to try a different anti-seizure medication before approving Keppra.  The record does not contain evidence of a prior instance of Plaintiff experiencing an allergic reaction to Dilantin.  When Plaintiff began to suffer the reaction, prison staff ensured that he received prompt medical attention.  In addition, immediately after the allergic reaction they began to administer Keppra.  Accordingly, no reasonable jury could conclude that Defendants were deliberately indifferent in administering Dilantin in 2009, which caused Plaintiff's allergic reaction and resulting hospital stay.

## V.

For the reasons set forth herein, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED** and that judgment be entered in favor of Defendants.  (ECF No. 46.)

## VI.

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: August 5, 2013            _____/s/ *Elizabeth A. Preston Deavers*_____
                                       Elizabeth A. Preston Deavers
                                       United States Magistrate Judge